Filed 1/22/15  In re Y.B. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Y.B., a Person Coming Under the Juvenile Court Law. | B254134 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>A.R. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. CK69473) |

APPEAL from orders of the Superior Court of Los Angeles County, Marilyn Martinez, Juvenile Court Referee.  Affirmed.

Kate M. Chandler, under appointment by the Court of Appeal, for Defendant and Appellant Mother A.R..

Karen Jean Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Father A.B.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Appellant.

A.R. (Mother) and A.B. (Father) have four children, (D.B., Ann Marie, Edward and Y.B.). Both Mother and Father appeal from orders regarding Y.B. made on January 23, 2014, after the Department of Children and Family Services (the Department) filed a petition pursuant to Welfare and Institutions Code section 387.[1] The Department filed a cross-appeal. We affirm the orders of the juvenile court.

FACTUAL & PROCEDURAL BACKGROUND

*Events occurring prior to the birth of Y.B.*

Mother was a dependent of the juvenile court from 2000 to 2008.

Father has two other families. Father and his first wife have five children (Rebecca, Naomi, and three others). Father and Kathy have four children, Emily, Alexander , G. B. and V.B. All of these children are older than his children with Mother.

Father had sustained counts of domestic violence against him as to Emily, Alexander, G.B. and V.B.

D.B. was born in July 2007.

In August 2007, Mother and Father hit each other in front of D.B., and a petition was filed on D.B.'s behalf. In November 2008, Father and Kathy fought in front of D.B. Shortly thereafter, Father allegedly struck D.B., Emily and Alexander. In May 2011, Mother and Father's parental rights were terminated as to D.B. D.B. was placed with Father's adult daughter, Rebecca, and was eventually adopted by her.

In July 2010, Mother went to Wisconsin to give birth to Ann Marie, apparently in an effort to maintain custody of her. Ann Marie was also placed with Rebecca.

In July 2011, the Department filed a petition as to Ann Marie pursuant to section 300, subdivisions (a), (b), and (j).

Edward was born in 2011. In November 2011, Naomi alleged domestic violence by Father against her and Edward. . The Department filed a petition as to Edward pursuant to section 300, subdivisions (a), (b), and (j).

---

[1]     All subsequent statutory references shall be to the Welfare and Institutions Code.

In December 2011, the court found there was no reason to find the Indian Child Welfare Act (ICWA) applied to Father.

In December 2011, Mother was diagnosed with Mild Mental Retardation.

In January 2012, the court sustained the petition as to Ann Marie and Edward based on domestic violence between Mother and Father, Father and Kathy, as well as physical abuse by Father towards D.B and Emily, pursuant to section 300, subdivisions (b) and ( j).  Both Ann Marie and Edward were removed from Mother and Father's custody and placed with Rebecca.  Father and Mother were ordered to complete parenting, anger management classes and to receive individual counseling.  Father was ordered to complete domestic violence classes.  Neither parent started participating in the case plan until July 2012.

*After the birth of Y.B.*

Y.B. was born in January 2013.

Shortly thereafter, when the social worker visited Mother and Father's home, an adult male arrived and said the Department was not legally permitted to remove Y.B. because the family was under the provisions of  ICWA.  The male introduced himself as Apache Running Hawk Daklugie[2] and claimed to be affiliated with the Native American council board.

The Department scheduled a Team Decision Making meeting (TDM) on January 22, 2013, and the parents denied allegations of abuse and neglect.  The social worker reported that Apache appeared to be recording the meeting and was coaching the parents or rephrasing their answers.  The adult siblings, Rebecca and Naomi, expressed concerns over Y.B.'s safety.

On January 25, 2013, the Department filed a petition pursuant to section 300, subdivisions (a), (b), and (j), on behalf of Y.B. based on the domestic violence between Father and Mother, Father and Kathy, and Father's abuse of D.B. and Emily.

---

[2]     Daklugie is referred to in this opinion as Apache because that is how the parties refer to him in their briefs.  We intend no disrespect.

The court found that Father was Y.B.'s presumed father and that ICWA did not apply to this case.

Before a March 2013 hearing, the social worker filed a Last Minute Information, reporting that the parents were in partial compliance with their case plans and had been participating in parenting, anger management, and domestic violence classes as well as individual counseling since July 2012. Both parents were consistent with their visitation with Ann Marie and Edward.

At the hearing on March 13, 2013, Y.B. was declared a dependent under section 300, subdivision (j). Counts alleged pursuant to section 300, subdivisions (a) and (b) were dismissed. Y.B. was placed in the home of parents. Mother and Father were granted unmonitored day visits with Ann Marie and Edward.

On April 17, 2013, the court allowed the unmonitored visits with Ann Marie and Edward as long as both parents were present in the home and no other adults were in the home without Department approval.

Rebecca told the social worker in July 2013 she was concerned about the children because Mother was short tempered around them. She noticed when the children visited Mother, their sippy cups were not clean and had moldy milk. Rebecca reported that Mother said she did not like to drive the children to doctor appointments because she had to save gas in the car for Father.

On July 12, 2013, Father called the social worker, saying he was concerned because Mother was dating Apache, who had a criminal background. Father said Mother would take Y.B. with her when Apache was driving under the influence of drugs. After seeing Apache, Mother often had marks and bruises. A few days later, Father told the social worker Mother had hit Ann Marie and Edward.

The social worker went to visit the family home and found Mother with the children. Mother said Father was out with Apache, and Apache's daughter was in the house. When Apache returned, he told the social worker he was the parents' mentor.

Ann Marie said when she got into trouble, Mother would hit her in the head. Mother then refused to let Ann Marie speak further with the social worker.

4

Father told the social worker that he was afraid because he had seen Apache drive under the influence, "swerving all over the road," and he was afraid the children would be hurt when Apache was transporting them. He said he planned to obtain a restraining order against Mother and Apache.

The social worker advised that she was taking the children into protective custody and a TDM would be held the next day. Mother did not allow the social worker to take the children.

At the TDM on July 19, 2013, social workers and family members attempted to tell Mother that Apache had a criminal record and abused drugs, and was involved in underground fighting. Mother said that it was fine for Apache to be around the children because he was her spiritual advisor and took only prescription drugs. Mother insisted he would not hurt the children and said she wanted to spend time with him; admitting she was having an affair with him. Mother denied any physical abuse against the children. Father accused Mother of hitting Ann Marie and Edward. Father said Mother would leave with Y.B. early in the morning and would not return until 1:00 or 2:00 a.m. She would call Father to pick her up when Apache was under the influence.

At the TDM, the children were dirty, with knots in their hair. Edward had at least one bruise. Y.B. was drinking from a bottle with mold on the nipple. Mother acted strangely at the meeting and abruptly left, calling Apache to pick her up. After the TDM, Father was told to seek a restraining order against Apache and Mother. The Department took the children into custody at the meeting and placed them with Rebecca.

Father stated at the TDM he was very concerned about the safety of the children but did not feel "that he can protect the children at this time from mother and Apache." Father said he agreed with the detention of the children and wanted them placed with Rebecca. Father stated that "when he is able to get some things done and able to protect the children and provide for them he would like to see them returned to his care."

After the TDM, Father called the social worker and left a message reporting Mother and Apache were threatening him and he was afraid.

5

On July 24, 2013, the Department filed a 387 petition on behalf of Ann Marie, Edward and Y.B.[3]

The petition alleged as follows: Count s-1: Ann Marie was physically abused by their mother with her hands and a brush; Father failed to protect Ann Marie, endangering her physical health and safety and placing her and her siblings at risk of physical harm, damage, danger, physical abuse and failure to protect; Count s-2 Edward was physically abused by Mother, Father failed to protect him and allowed Mother to have access to him, endangering Edward and siblings Ann Marie and Y.B. at risk of physical harm, damage, danger physical abuse and failure to protect; Count s-3: Mother and Father engaged in a violent altercation in the children's presence which endangered the children's physical health and safety and placed the children at risk of physical harm, damage and danger.[4]

In September and October 2013, the social worker reported that Mother was visiting the children but Ann Marie was avoiding Mother and sometimes threw tantrums during the visits.

Mother played a recording for the social worker of Father saying that "he was going to get unmonitored visits and that he would allow [M]other to be around the children when he had them. He stated that [M]other could hide in the back bedroom if DCFS came that way no one would know." The social worker asked Father about the recording and he told her he said those things to "play along with [M]other."

---

[3] Section 387 provides for a change of placement from the custody of a parent. It provides in pertinent part: "(a) An order changing or modifying a previous order by removing a child from the physical custody of a parent . . . and directing placement in a foster home . . . shall be made only after noticed hearing upon a supplemental petition. [¶] (b) The supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child . . . ."

[4] The allegations about Y.B.'s bottle and the children being dirty and unkempt were apparently deleted later.

In November 2013, Mother was living with Father. She was participating in parenting and home management classes. A Regional Center worker said Mother was a "great parent" but admitted there was evidence that Mother hit Ann Marie on the nose with a hair brush.

At the December 5, 2013 hearing on the section 387 petition, Father testified. He said there were two incidents in mid-July when Mother had hit Ann Marie. He then said there was another incident a few days later when she hit Edward with a hair brush. Father testified that he called the social worker in July because he was concerned because Mother was dating Apache who had a criminal history and she allowed him to be around Y.B. Father stated he had been with Apache when he was driving under the influence of drugs. Father said Apache was under the influence of drugs "all the time." Father said he told the social worker about it and she told him to call the Department hotline. When he called the hotline, he was told they could not do anything about it.

He said Mother went back and forth between his house and Apache's and in July she came home with bruises. Mother stayed with Father because she was afraid of Apache.

The court admitted the social workers' reports into evidence and took judicial notice of all prior findings and orders.

The court stated it would sustain the section 387 petition but would combine all three counts into one amended count, S-1, as follows: "The children, Ann Marie, Edward, and [Y.B.], have not been sufficiently cared for such that Ann Marie and Edward have been physically abused by their [M]other with her hands and a brush. [Y.B.] has, for extended periods of time, been in the presence of a known drug abuser. [¶] The parents have endangered the children's well-being by allowing them to be dirty and unkempt, and [Y.B.] drinking from a baby bottle with mold on the nipple." It continued the matter for disposition.

At the disposition hearing on January 23, 2014, Mother had moved out of Father's house. She produced records of attending parenting and anger management classes from 2012 to mid-2013.

The juvenile court found Mother still had anger management issues, was not current with her case plan and had not made reasonable efforts to treat her problems, as she was still in a relationship with Father.

It further stated that although the parents had made sufficient progress at the March 13th disposition hearing to have Y.B. in their custody, conditions had changed and the section 387 petition was filed. The court discussed the allegations in the section 387 petition, that Mother had abused Ann Marie and Edward, that Mother had a relationship with Apache who was a drug user, and both parents allowed Apache to be in their home. The three children were dirty and unkempt, Y.B. drank from a moldy bottle and the parents were neglectful of their children.

The court terminated reunification services to Mother with respect to Ann Marie, Y.B., and Edward pursuant to section 361.5, subdivision (b)(10).[5]

The juvenile court also found that Father knew Mother was hitting the children, minimized the issues and did not protect the children from Mother by moving out. He allowed Apache in the home even after he knew that Apache had a criminal history and was using drugs. It terminated reunification services for Father as to Ann Marie and Edward. It ordered Father to receive reunification services as to Y.B. but ordered Y.B. removed from the home.

The court stated: "While the parents do not currently evidence issues of domestic violence, throughout the history of their case and their children with this court, they evidence a dysfunctional relationship. . . . [¶] [Father] was aware that [Mother] hit the two older children, Ann Marie and Edward, after they were returned to his custody. He

---

5    That section provides: "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶¶] (10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

didn't do anything very rapidly. . . . [¶¶] It is true that [Father] ultimately contacted the social worker with his concerns, and yet he remains in a relationship with [Mother]. [¶] He has told the social workers many times that he is through with the mother, and just within the last day or perhaps week, did he separate from her. [¶] I don't think he has ever been through with [Mother]. [¶] These children . . . cannot be in his custody because of many reasons, one of which is his dysfunctional relationship with [Mother] and his inability to separate from her . . . . [¶] Ann Marie and Edward have lacked stability. They both are in need of therapy. Ann Marie is being evaluated for posttraumatic stress disorder. Edward exhibits tantrums. These children are entitled to stability. The parents are still living an unstable, dysfunctional lifestyle. [¶¶] [Mother] denies hitting Ann Marie and Edward. She fails to take any responsibility for her conduct. She appear[s] to not understand what physical abuse is, even though she attended programs and purportedly made progress. She, in fact, has not made progress. She has not made reasonable efforts to implement what she purportedly learned in her prior programs. She continues to perpetrate physical abuse on children. She continues to not ensure children's health and well-being. She continues to be in a relationship with [Father], which is fraught with dysfunction. [¶] [Father] has a long history of abusing children and perpetrating domestic violence on not only [Mother] but another as well. I don't have current evidence that he is perpetrating domestic violence or physical abuse on children. [¶¶] These parents continue after 24 months of supervision to still not have a stable relationship, to not incorporate appropriate skills they say they have learned in parenting. The children were dirty and unkempt; allowing the baby to drink from a moldy baby bottle. Children do not need to wait for their parents to learn how to parent, to learn how to live their own stable, functional lifestyle, to gain sufficient parenting skills, including protective capabilities. [¶] So in summary, I have terminated reunification for Ann Marie and Edward . . . . [¶¶] As to Father, I am discontinuing reunification for Ann Marie and Edward for the same reasons . . . ."

9

*Subsequent orders*

While these appeals were pending, a review hearing originally scheduled for July 24, 2014 was continued for a contested hearing until September 30, 2014. On that date, the hearing again was continued to December 11, 2014.

At the hearing on December 11, the court received into evidence a new report from the Department and made findings with respect to Ann Marie, Edward and Y.B. It found inter alia, that return of the minors to the physical custody of the parents would create a substantial risk of detriment to their physical or emotional well being, return of the children to either of the parents at this time would likely result in either severe emotional or severe physical harm to the children, a permanent plan of suitable placement was appropriate, and terminated family reunification services for Father. The matter was continued until June 11, 2015 for a review of the permanent plan.

CONTENTIONS ON APPEAL

On appeal, Mother contends that the court erred in terminating reunification services. She argues that she had completed therapy, parenting and domestic violence classes and had visited consistently. She contends that although the family was dysfunctional, there had been no further incidents of domestic violence. She points to the juvenile court's order of March 2013 in which it found she was in compliance with her case plan and argues that the orders appealed from are contrary to those earlier findings. Finally, she contends that her slow progress can be attributed to her developmental disabilities and the fact that she herself was a dependent of the juvenile court.

Father contends on appeal that Y.B. should not have been removed from his home because there was no evidence Y.B. was neglected or suffered while in his custody. He argues that he cooperated with the social workers and did contact them when Mother and Apache took the children but that the Department told him it could not help him.

The Department contends the court should not have dismissed counts s-1, s-2, and s-3 of the section 387 petition.

10

DISCUSSION

*1. The court properly terminated reunification services for Mother*

Typically, when a child is removed from parental custody, the juvenile court must order services to facilitate the reunification of the family. (§ 361.5, subd. (a).) There are certain exceptions when it may be fruitless to provide those services. One of the exceptions is contained in subdivision (b)(10) of section 361.5, which authorizes the denial of services to a parent who has failed to reunify with another child or whose parental rights to another child were terminated if the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling."

The "reasonable effort" requirement focuses on the extent of the parent's efforts, not on the degree of progress. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.) "It is certainly appropriate for the juvenile court to consider the duration, extent and context of the parent's efforts, as well as any other factors relating to the quality and quantity of those efforts, when evaluating the effort for reasonableness." (*Ibid*.; italics omitted.)

An order denying reunification services is reviewed for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) We resolve all conflicts in the evidence in favor of the juvenile court's finding. (*In re Gabriel K*. (2012) 203 Cal.App.4th 188, 196.)

Here, the court specifically found that Mother had not made reasonable efforts to treat the problems that led to the removal of D.B. We agree with its findings. Although Mother may have completed classes and attended counseling, her actions after the March 2013 hearing show that she had not attempted to use any of the techniques she had learned in those classes. She was involved in a relationship with Apache and returned home from Apache's house with bruises in July 2013. She continued to maintain a relationship with Father after he committed several incidents of domestic abuse. These facts support the finding that she had not made reasonable efforts to prevent her children's exposure to domestic violence.

11

In addition, although she had attended anger management classes, she did not apply that knowledge to assist in dealing with adverse situations as demonstrated by her behavior at the TDM. Although she had attended parenting classes, she also did not make efforts to apply those skills: she denied any allegations of Apache's drug abuse; allowed Apache to drive her and Y.B. even though Father had complained of his reckless driving while under the influence; and did not exercise proper care and hygiene when caring for the children, as evidenced by their appearance at the TDM and the condition of Y.B.'s bottle.

Furthermore, while she may have had issues related to her mental health and previous dependency, she was still placing Y.B.'s life in danger by having a relationship with Apache and Father. Mother continued to deny there was any domestic abuse or neglect of the children. She could not correct the problem if she failed to acknowledge it. (*In re Gabriel K., supra*, 203 Cal.App.4th at p. 197.)

We conclude there was substantial evidence to support the juvenile court's order denying reunification services to Mother as to Y.B.

2. *The court properly ordered removal of Y.B. from Father's custody*

Under section 361, subdivision (c)(1), a juvenile court may order the removal of a dependent child from the physical custody of his or her parents if the court finds by clear and convincing evidence that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) That same subdivision goes on to state "[t]he court shall also consider, as a reasonable means to protect the minor, allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1).) "'A removal order is proper if based on proof of a parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. . . .'" (*In re A.S.*

12

(2011) 202 Cal.App.4th 237, 247.) Jurisdictional findings are prima facie evidence the child cannot safely remain in the custody of the parent. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)

"""The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.""" (*In re A.S., supra,* 202 Cal.App.4th at p. 247.) """The focus of the statute is on averting harm to the child.""" (*Ibid.*) "'The court may consider a parent's past conduct as well as present circumstances.'" (*Ibid.*) "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.)

We review a juvenile court's disposition order removing a child from parental custody for substantial evidence, while recognizing that the orders must be based on clear and convincing evidence. (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; see *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.) "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the [juvenile] court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)

Father contends that the children were safe in his custody, yet allowed Mother to take Y.B. when she went to visit Apache, even though Father had complained about Apache's drug abuse. He knew Apache was driving under the influence and still allowed Mother to take Y.B. in Apache's car. He allowed Mother to come back and forth from Apache's even though she said she was afraid of Apache and had returned home with bruises.

Although Father attempts to show that he was trying to protect Y.B. by reporting the incidents to the Department, it is clear that he had been making the same accusations and complaints for several months without taking any action. He spoke about obtaining a restraining order against Mother in July 2013 but did not do so. He was complicit in allowing Apache unfettered access to the home and was even out with him when the

social worker visited in the house. He told Mother he would lie to the Department so she could have unmonitored visits with the children.

The juvenile court also had before it evidence of several previous incidents of domestic violence by Father. This evidence, combined with the evidence Father allowed Y.B. to be in harmful situations with Apache, and did not act affirmatively to protect Y.B. was clear and convincing and was sufficient evidence to support the court's order removing Y.B. from Father's custody.

*3. The Department's Cross Appeal*

The Department contends the court erred in not sustaining the three counts alleged in the section 387 petition. The court, after hearing evidence, combined all three counts into a single amended count. The Department concedes in its Reply Brief that this contention is made in the event Father's appeal is successful. Because we have affirmed the juvenile court's orders with respect to Y.B., we need not reach the issues presented in the Department's cross-appeal.

DISPOSITION

The juvenile court's orders made on January 23, 2014, regarding Y.B., are affirmed.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**                    **SEGAL, J.** [*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14